interest in any Fees and TMG Member and its Affiliates shall have the sole right to earn and retain all such Fees.

13. Dissolution and Termination:

(a) The Company shall be dissolved and its business wound up upon the earlier to occur of any of the following events:

(i) the written consent of TMG Member;

(ii) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Delaware Act; or

(iii) the disposition of all or substantially all of the assets of the Company.

(b) Upon dissolution, the Company's business shall be liquidated in an orderly manner. TMG Member shall act as the liquidator (unless it elects to appoint a liquidator) to wind up the business of the Company pursuant to this Agreement. If there shall be no TMG Member, the successors-in-interest thereof may approve one or more liquidators to act as the liquidator in carrying out such liquidation. In performing its duties, the liquidator is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Company in accordance with the Delaware Act and in any manner that the liquidator shall determine in good faith.

(c) In the event it becomes necessary in connection with the liquidation of the Company to make a distribution of property in kind, such property shall be transferred and conveyed to the Members so as to vest in each of them, as a tenant-in-common, an undivided interest in the whole of such property equal to their interests in the property based upon the amount of cash that would be distributed to each of the Members in accordance with Section 12(a) hereof if such property were sold for an amount of cash equal to the fair market value of such property, as determined by the liquidator in good faith.

(d) Any liquidating distribution shall be made no later than the later to occur of (i) the end of the taxable year during which such liquidation occurs and (ii) 90 days after the date of such liquidation.

14. Transfers of Interests: No Member shall have the right to sell, assign, pledge, transfer or otherwise dispose of (each a "Transfer") all or any part of its interest in the Company without the approval of TMG Member, and any purported sale, assignment, transfer or other disposition of all or any part of an interest in the Company in contravention hereof shall be null and void and of no force and effect. Substitute or additional Members shall only be admitted to the Company upon the prior written reasonable approval of TMG Member.

15. Indemnification: No Member shall be liable to the Company or to any other

Member for monetary damages for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by it arising out of or in connection with this Agreement or the Company's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Member's willful misconduct. The Company shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless each Member, director and officer against any losses, claims, damages or liabilities to which such Member, director or officer may become subject in connection with any matter arising out of or in connection with this Agreement or the Company's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Member's willful misconduct. If any Member becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with the Company's business or affairs, the Company shall reimburse such Member for its reasonable legal and other reasonable out-of-pocket expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith, provided that such Member shall promptly repay to the Company the amount of any such reimbursed expenses paid to it if it shall ultimately be determined that such Member was not entitled to be indemnified by the Company in connection with such action, proceeding or investigation. If for any reason (other than the willful misconduct of such Member) the foregoing indemnification is unavailable to such Member, or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Member as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and such Member on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations. The provisions of this Section 15 shall survive for a period of four (4) years from the date of dissolution of the Company, provided that (i) if at the end of such period there are any actions, proceedings or investigations then pending, any Member may so notify the Company and the other Members at such time (which notice shall include a brief description of each such action, proceeding or investigation and the liabilities asserted therein) and the provisions of this Section 15 shall survive with respect to each such action, proceeding or investigation set forth in such notice (or any related action, proceeding or investigation based upon the same or similar claim) until such date that such action, proceeding or investigation is finally resolved, and (ii) the obligations of the Company under this Section 15 shall be satisfied solely out of Company assets. Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Company under this Section 15 shall (i) be in addition to any liability which the Company may otherwise have and (ii) inure to the benefit of the Members, their respective Affiliates and their respective members, directors, officers, employees, agents and Affiliates and any successors, assigns, heirs and personal representatives of such persons.

16. <u>Liability of the Members</u>: The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member. The liability of each Member shall be limited to the amount of capital contributions, if any, required to be made by such Member in accordance with the provisions of this Agreement, but only when and to the extent the same shall become due pursuant to the provisions of this Agreement.

17. <u>Certain Waivers</u>: Except as otherwise expressly provided in this Agreement, each

09734.192 2412851v2
18513\3661020.2

8

Case: 11-49300   Doc# 298-6   Filed: 05/16/13   Entered: 05/16/13 18:41:19   Page 2 of 18

of the Members hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law, or to file a complaint or to institute any proceeding at law or in equity to cause the termination, dissolution and liquidation of the Company. Each of the Members has been induced to enter into this Agreement in reliance upon the waivers set forth in this Section 17, and without such waivers no Members would have entered into this Agreement. No Member shall have any interest in any specific assets of the Company.

18. <u>Books, Records, Accounting and Reports</u>:

(a) <u>Books and Records</u>: The Company shall maintain, or cause to be maintained, in a manner customary and consistent with good accounting principles, practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Company) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the property of the Company. Such books and records of account shall be prepared and maintained at the principal place of business of the Company or such other place or places as may from time to time be determined by the Members. Each Member or its duly authorized representative shall have the right to inspect, examine and copy such books and records of account at the Company's office during reasonable business hours. A reasonable charge for copying books and records may be charged by the Company.

(b) <u>Accounting and Fiscal Year</u>: The books of the Company shall be kept on an accounting basis selected by TMG Member. The fiscal year of the Company shall end on December 31 of each year, unless a different fiscal year shall be required by the Code.

(c) <u>The Company Accountant</u>: The Company shall retain as the regular accountant and auditor for the Company (the "<u>Company Accountant</u>") an accounting firm designated by TMG Member. The fees and expenses of the Company Accountant shall be a Company expense.

(d) <u>Reserves</u>: TMG Member may, subject to such conditions and in such amounts as it shall determine in good faith, establish reserves for the purposes and requirements as it may deem appropriate.

19. <u>UBTI</u>: Subject to Section 7, the Company will use its reasonable efforts to structure its direct and indirect subsidiaries and Affiliates, and to otherwise conduct the business of the Company and its subsidiaries, so as to minimize the amount of any "unrelated business taxable income" as described in Sections 512 through 514 of the Code.

20. <u>SPE</u>: The sole business of the Company shall be as set forth in Section 5. The Company shall not have employees.

21. <u>Miscellaneous</u>:

(a) <u>Further Assurances</u>: Each Member agrees to execute, acknowledge,

09734.192 2412851v2
18513\3661020.2

9

Case: 11-49300   Doc# 298-6   Filed: 05/16/13   Entered: 05/16/13 18:41:19   Page 3 of 18

deliver, file, record and publish such further instruments and documents, and do all such other acts and things as may be required by law, or as may be required to carry out the intent and purposes of this Agreement.

(b) Notices: All notices, demands, consents, approvals, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by (i) personal delivery, (ii) facsimile transmission or (iii) a nationally recognized overnight courier service, fees prepaid, addressed as follows:

| | |
|---|---|
| If to TMG Member: | 100 Bush Street<br>Suite 2600<br>San Francisco, CA 94104<br>Attention: Matt Field |
| With copies to: | Scott Verges<br>100 Bush Street<br>Suite 2600<br>San Francisco, CA 94104 |
| If to the Passive Member: | David Choo<br>660 Fourth Street, No. 155<br>San Francisco, CA 94107 |

Any Member may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 21(b). A Notice sent in compliance with the provisions of this Section 21(b) shall be deemed given on the date of receipt.

(c) Successors and Assigns: This Agreement shall be binding upon the parties hereto and their respective executors, administrators, legal representatives, heirs, successors and assigns, and shall inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective executors, administrators, legal representatives, heirs, successors and assigns.

(d) Severability: In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and other application thereof shall not in any way be affected or impaired thereby.

(e) Amendments: Subject to Section 7(d) above, this Agreement may be amended by a written instrument executed by TMG Member.

(f) Governing Law: This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed wholly within that State.

(g) Attorneys' Fees: If the Company or any Member obtains a judgment against any Member by reason of the breach of this Agreement or the failure to comply with the terms hereof, reasonable attorneys' fees and costs as fixed by the court shall be included in such

judgment.

(h) Captions: All titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision in this Agreement.

(i) Creditors Not Benefited: Nothing contained in this Agreement is intended or shall be deemed to benefit any creditor of the Company or any Member, and no creditor of the Company shall be entitled to require the Company or the Members to solicit or accept any capital contribution for the Company or to enforce any right which the Company or any Member may have against any Member under this Agreement.

(j) Entire Agreement: This Agreement contains the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

(k) Publicity. The parties agree that no Member shall issue any press release or otherwise publicize or disclose the terms of this Agreement, without the consent of TMG Member, except as such disclosure may be made in the course of normal reporting practices by any Member to its members, shareholders or partners or as otherwise required by law.

(l) Confidentiality. The terms of this Agreement, the identity of the parties to this Agreement, the identity of any person with whom the Company may be holding discussions with respect to any investment, acquisition, disposition or other transaction, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company or the relative or absolute rights or interests of any of the Members (collectively, the "Confidential Information") is confidential and proprietary information of the Company, the disclosure of which without the authorization of TMG Member would cause irreparable harm to the Company and the Members. Accordingly, the Passive Member represents that it has not and agrees that, except as may be authorized by TMG Member or until TMG Member has publicly disclosed the applicable Confidential Information, it will not and will direct its shareholders, partners, directors, officers, agents, advisors and Affiliates not to, disclose to any person or entity any Confidential Information or confirm any statement made by third parties regarding Confidential Information; provided, however, that the Passive Member (or its Affiliates) may disclose such Confidential Information if required by law (it being specifically understood and agreed that anything set forth in a registration statement or any other document filed pursuant to law will be deemed required by law), and to its attorneys and advisors and prospective investors and lenders who agree to maintain a similar confidence. The covenants contained in this Section 21(l) will survive the Transfer of any Member's interest in the Company (or under this Agreement) and the termination of the Company.

(m) Venue: Each party hereto agrees that any claim, action or relief by any party against any other party based on or arising out of this Agreement shall be brought only in the Chancery Court of the State of Delaware (or other appropriate state court in the State of Delaware) or the Federal courts located in the State of Delaware, and not in any other State or Federal court.

(n) WAIVER OF JURY TRIAL: EACH OF THE MEMBERS HEREBY WAIVES TRIAL BY JURY IN ANY ACTION ARISING OUT OF MATTERS RELATED TO THIS AGREEMENT, WHICH WAIVER IS INFORMED AND VOLUNTARY.

(o) Counterparts: This Agreement may be executed in multiple counterparts, each of which shall be an original but all of which together shall constitute but one and the same agreement. A counterpart may be delivered by fax of such signed counterpart or by e-mail of a PDF of such signed counterpart, or by physical delivery (through the US Mail or otherwise) of such counterpart.

(p) Duties and Conflicts: Each of the Members recognizes, acknowledges and agrees as follows:

(i) each of the Members and their respective Affiliates, employees, agents and representatives have or may have in the future other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and are entitled to carry on such other business interests, activities and investments;

(ii) each of the Members and their respective Affiliates, employees, agents and representatives may engage, invest in and/or possess an interest in, independently, with one another, or with others, any business activity of any type or description, including without limitation, those that might be the same as or similar to the business of the Company and that might be in direct or indirect competition with the Company, and including, without limitation, owning, financing, acquiring, leasing, promoting, developing, improving, operating, managing and servicing real property and mortgage loans on its own behalf or on behalf of other entities with which any of the Members is Affiliated or otherwise;

(iii) each of the Members and their respective Affiliates, employees, agents and representatives may engage in any activities described in this Section 21(p), whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to the other Members;

(iv) neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such ventures or activities, or the income or profits derived therefrom, and the pursuit of any activities described in this Section 21(p), even if competitive with the business of the Company, shall not be deemed wrongful or improper;

(v) the obligations and duties of the Members to each other and to the Company shall be solely as provided herein, and neither the Members nor their respective Affiliates shall be obligated to present any investment opportunity or prospective economic advantage to the Company or the Members, even if the opportunity is of the character that, if presented to the Company or the Members, could be taken by any of them; and

(vi) without limitation on the foregoing, to the fullest extent permitted by applicable law, no Member shall have any fiduciary duties towards any other Member, the Company or any direct or indirect subsidiary of the Company.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, this Agreement has been executed as of the date set forth in the introductory paragraph hereof.

TMG FM MEMBER LLC,
A Delaware limited liability company

By: TMG Partners,
    A California corporation
Its: Manager

By: _____
Its: _____

09734.192 2412851v2
18513\3661020.2

Signature Page

Case: 11-49300   Doc# 298-6   Filed: 05/16/13   Entered: 05/16/13 18:41:19   Page 7 of 18

# SCHEDULE A

## Tax Matters

Section 1. <u>Defined Terms</u>. Capitalized terms used in this Schedule shall have the meanings set forth herein. Capitalized terms used but not otherwise defined in this Schedule shall have the meaning given to the same elsewhere in the Agreement to which this Schedule is attached. Section references used in this Schedule shall refer to the Sections of this Schedule except as otherwise expressly stated.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member for any taxable year or other period, the deficit balance, if any, in such Member's Capital Account as of the end of such year or other period, after giving effect to the following adjustments:

(a) credit to such Capital Account any amounts that such Member is obligated to restore or is deemed obligated to restore as described in the penultimate sentence of Treasury Regulation Section 1.704-2(g)(1) and in Treasury Regulation Section 1.704-2(i); and

(b) debit to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"<u>Book Basis</u>" means, with respect to any asset of the Company, the adjusted basis of such asset for federal income tax purposes; provided, however, that (a) if any asset is contributed to the Company, the initial Book Basis of such asset shall equal its fair market value on the date of contribution as determined by TMG Member, and (b) the Book Basis of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by TMG Member, as of the following: (i) the acquisition of an additional Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest the Company; (iii) in connection with the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); and (iv) in any other circumstances as permitted by the Code or Treasury Regulations; provided, further, that adjustments pursuant to clauses (i), (ii) and (iv) above shall be made only if TMG Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company after taking into account the intent expressed in Section 5. The Book Basis of all assets of the Company shall be adjusted thereafter by depreciation as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(g) and any other adjustment to the basis of such assets other than depreciation or amortization.

"<u>Capital Account</u>" means the separate account maintained for each Member under Section 2.

"<u>Company Minimum Gain</u>" means "partnership minimum gain" as defined in Treasury Regulation Section 1.704-2(d).

"<u>Loss</u>" means, for each taxable year or other period, an amount equal to the Company's items of taxable deduction and loss for such year or other period, determined in accordance with

Section 703(a) of the Code (including all items of loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Loss, will be considered an item of Loss;

(b) loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such property, notwithstanding that the adjusted tax basis of such property may differ from its Book Basis;

(c) in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(d) any items of deduction and loss specially allocated pursuant to Section 4 shall not be considered in determining Loss; and

(e) any decrease to Capital Accounts as a result of any adjustment to the Book Basis of Company assets pursuant to Treasury Regulation Section 1.704-1(b)(2) (iv)(f) or (g) shall constitute an item of Loss.

"Member Minimum Gain" means the Company's "partner nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(2).

"Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" means "partner nonrecourse deductions" as defined in Treasury Regulation Section 1.704-2(i)(2).

"Net Loss" means, for any period, the excess of (i) Losses for such period, over (ii) Profits, if applicable, for such period determined without regard to any Profits or Losses allocated pursuant to Section 4.

"Net Profit" means, for any period, the excess of (i) Profits for such period, over (ii) Losses, if applicable, for such period determined without regard to any Profits or Losses allocated pursuant to Section 4.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"Profit" means, for each taxable year or other period, an amount equal to the Company's items of taxable income and gain for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income and gain required to be stated

separately under Section 703(a)(1) of the Code), with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit will be added to Profit;

(b) any gain resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such property, notwithstanding that the adjusted tax basis of such property may differ from its Book Basis;

(c) any items specially allocated pursuant to Section 8 shall not be considered in determining Profit; and

(d) any increase to Capital Accounts as a result of any adjustment to the Book Basis of Company assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) or (g) shall constitute an item of Profit.

"Treasury Regulation" or "Regulation" means, with respect to any referenced provision, such provision of the regulations of the United States Department of the Treasury or any successor provision.

"UBTI" means "unrelated business taxable income" as defined in Code Sections 512 through 514.

"U.S. Person" means a United States citizen, a permanent resident of the United States, an entity organized under the laws of the United States or any of its territories or having its principal place of business within the United States or any of its territories, or any other Person that is a "United States person" as described in, or for the purposes of, Executive Order 13224 of September 23, 2001 or any amendment, replacement or other modification thereto.

Section 2. Capital Accounts. A separate Capital Account will be maintained for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv). Consistent therewith, the Capital Account of each Member will be determined and adjusted as follows:

(a) Each Member's Capital Account will be credited with: (i) any contributions of cash made by such Member to the capital of the Company plus the fair market value of any property contributed by such Member to the capital of the Company (net of any liabilities to which such property is subject or which are assumed by the Company); (ii) the Member's distributive share of Net Profit and any items in the nature of income or gain specially allocated to such Member pursuant to Section 3; and (iii) any other increases required by Treasury Regulation Section 1.704-1(b)(2)(iv), without duplication.

(b) Each Member's Capital Account will be debited with: (i) any distributions of cash made from the Company to such Member plus the fair market value of any property distributed in kind to such Member (net of any liabilities to which such property is subject or which are assumed by such Member); (ii) the Member's distributive share of Net Loss and any items in the nature of expenses or losses specially allocated to such Member pursuant to Section 3; and (iii) any other decreases required by Treasury Regulation Section 1.704-1(b)(2)(iv), without

duplication.

(c) The initial Capital Account balance of each shall be determined in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f). Any expenses borne by a Member for its own account will not increase such Member's Capital Account, nor affect its share of Net Profit or Net Loss. The provisions of this Section 2 and any other provisions of this Schedule relating to the maintenance of Capital Accounts have been included in the Agreement to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.

Section 3.  Allocations of Net Profits and Net Losses.

(a) Except as otherwise specifically provided for in this Schedule A, Net Profits for each fiscal year will be allocated as follows:

(i) First, to the Members (pro rata in accordance with the aggregate amount of Net Losses allocated to such Member pursuant to Section 3(b)(i) for all previous fiscal years), until the aggregate amount of Net Profits allocated to each Member pursuant to this Section 3(a)(i) for the current and all previous fiscal years is equal to the aggregate amount of Net Losses allocated to such Member pursuant to Section 3(b)(i) for all previous fiscal years.

(ii) Second, in an amount equal to the distributions received by any Member pursuant to Section 12(a)(i)(B) of the Agreement until the cumulative Net Profits allocated to such Members under this Section 3(a)(ii) are equal to the aggregate distributions received by such Members pursuant to Section 12(a)(i)(B) of the Agreement.

(iii) Third, to TMG Member in an amount equal to the distributions received by TMG Member pursuant to Section 12(a)(ii)(A) of the Agreement until the cumulative Net Profits allocated to TMG Member under this Section 3(a)(iii) are equal to the aggregate distributions received by TMG Members pursuant to Section 12(a)(ii)(A) of the Agreement.

(iv) Fourth, to the Member in amounts equal to the distributions received by such Members pursuant to Section 12(a)(ii)(B) of the Agreement until the cumulative Net Profits allocated to each Member under this Section 3(a)(iv) are equal to the aggregate distributions received by such Members pursuant to Section 12(a)(ii)(B) of the Agreement.

(v) Fifth, to the Members in proportion to their Percentage Interests.

(b) Except as otherwise specifically provided for in this Schedule A, Net Losses for each fiscal year will be allocated as follows:

(i) To the Members, pro rata in proportion to their respective maximum amount of Unreturned Capital Contributions.

Section 4.  Allocations and Compliance with Section 704(b). The following special allocations shall, except as otherwise provided, be made in the following order:

(a) Notwithstanding anything to the contrary contained in this Schedule A, if there is

a net decrease in Company Minimum Gain or in any Member Minimum Gain during any taxable year or other period, prior to any other allocation pursuant hereto, such Member shall be specially allocated items of Profit for such year (and, if necessary, subsequent years) in an amount and manner required by Treasury Regulation Sections 1.704-2(f) or 1.704-2(i)(4). The items of Profit to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2.

(b) Nonrecourse Deductions for any taxable year or other period shall be allocated (as nearly as possible) under Treasury Regulation Section 1.704-2 to TMG Member.

(c) Any Member Nonrecourse Deductions for any taxable year or other period shall be allocated to the Member that made or guaranteed or is otherwise liable with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with principles under Treasury Regulation Section 1.704-2(i).

(d) Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which causes or increases a negative balance in his or its Capital Account shall be allocated items of Profit sufficient to eliminate such increase or negative balance caused thereby, as quickly as possible, to the extent required by such Treasury Regulation.

(e) No allocation of an item of Loss shall be made to any Member if, as a result of such allocation, such Member would have an Adjusted Capital Account Deficit. Any such disallowed allocation shall be made to the Members entitled to receive such allocation under Treasury Regulation Section 1.704 in proportion to their respective Percentage Interests. If any item of Loss is reallocated under this subsection 4(e), subsequent allocations of Profit and Loss (and items thereof) shall be made so that, to the extent possible, the net amount allocated under this subsection 4(e) equals the amount that would have been allocated to each Member if no reallocation had occurred under this subsection 4(e).

(f) For purposes of Section 752 of the Code and the Treasury Regulations thereunder, excess nonrecourse liabilities (within the meaning of Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to TMG Member.

(g) The provisions of this Schedule A shall be interpreted in a manner consistent with the Members' intent that the allocations contained herein are "permitted allocations" under Section 514(c)(9)(E) of the Code and the Treasury Regulations thereunder and all allocations under this Schedule A shall be adjusted insofar as may be required to meet the requirements of Section 514(c)(9)(E) of the Code and the Treasury Regulations thereunder.

Section 5. <u>Intent of Allocations/Liquidating Distributions</u>. In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), liquidating distributions shall be made, in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2), to the Members in accordance with the distribution priorities set forth in <u>Section 12</u> of the Agreement. Notwithstanding that liquidating distributions will be made in accordance with the distribution priorities set forth in <u>Section 12</u> of the Agreement, the parties intend that the allocations made pursuant to this Schedule A will produce final Capital Account balances of the

Members that would permit liquidating distributions to be made in accordance with final Capital Account balances (after unpaid loans and interest thereon, including those owed to Members, have been paid) in a manner identical to the order of priorities set forth in Section 12 of the Agreement. Notwithstanding anything to the contrary (except to the extent inconsistent with Section 704(b) of the Code or compliance with the "fractions rule" set forth in Section 514(c)(9)(E) of the Code and the regulations thereunder) to the extent that the allocations made pursuant to this Agreement would fail to produce such final Capital Account balances as of the close of the taxable year in which the Company is liquidated: Net Profit and Net Loss of the Company for such taxable year (or items of Profit and Loss for such taxable year) shall be reallocated among the Members as necessary to produce such result (or, to the extent it is not possible to achieve such result with allocations of items of Profit and Loss for such taxable year, for prior open taxable years).

Section 6. Tax Matters. The Members intend for the Company to be treated as a partnership for federal income tax purposes. TMG Member shall make all applicable elections, determinations and other decisions under the Code and applicable Treasury Regulations, including, without limitation, the deductibility of a particular item of expense and the positions to be taken on the Company's tax return, and shall approve the settlement or compromise of all audit matters raised by the Internal Revenue Service affecting the Members generally. The Members shall each take reporting positions on their respective federal, state and local income tax returns consistent with the positions determined for the Company by TMG Member. TMG Member shall use commercially reasonable efforts to cause all federal, state and local income and other tax returns to be timely filed by the Company and, shall not be responsible for the delays of any other Member or accountants or auditors retained by TMG Member on behalf of the Company).

Section 7. Tax Matters Partner. TMG Member shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code and shall exercise all rights, obligations and duties of a tax matters partner under the Code.

Section 8. Section 704(c). In accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, income, gain, loss, deduction and tax depreciation with respect to any property contributed to the capital of the Company, or with respect to any property which has a Book Basis different than its adjusted tax basis, shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted tax basis of such property to the Company and the Book Basis of such property, in accordance with Section 2. Any elections, accounting conventions or other decisions relating to such allocations shall be made by TMG Member in a manner that complies with Code Sections 704(b) and 704(c) and the Treasury Regulations thereunder. For such allocations, TMG Member may select any method permitted in the Treasury Regulations under Code Section 704(c) with respect to such allocations, including the "traditional method", the "traditional method with curative allocations" and the "remedial allocation method".

Section 9. Withholding. All amounts required to be withheld pursuant to Section 1446 of the Code or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the Members for all purposes under the Agreement. If TMG Member determines in good faith that the Company has insufficient liquid assets to satisfy such

withholding obligation, the Member as to which withholding applies shall contribute cash to the Company in an amount sufficient to satisfy such withholding obligation.

Section 10. No Tax Confidentiality. Notwithstanding anything to the contrary contained in this Agreement, each Member (and each employee, agent or representative of each Member) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure except to the extent maintaining such confidentiality is necessary to comply with any applicable U.S. federal or state securities laws.

Section 11. Certain Transactions. The Members shall not knowingly cause the Company to engage directly or indirectly in a transaction that is a "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2). If any Member becomes aware that the Company has engaged directly or indirectly in a transaction that is a listed transaction or a "prohibited reportable transaction" as defined by Code Section 4965(e), it shall promptly notify each of the other Members.

# **EXHIBIT B-1**

# **MASTER LOI**

[to follow]

EXHIBIT "B-1"

# FM JV LLC TERM SHEET ("Term Sheet")

| | |
|---|---|
| **Parties:** | NWFM LLC ("**Northwood**"), which is an affiliate of Northwood Investors, LLC, and an affiliate ("**TMG**") of TMG Partners, collectively, the "**Members**". |
| **Property:** | The property consists of those certain parcels located on the northwest corner of First and Missions Streets, San Francisco, California (the "**Property**"). The Property is being purchased from an affiliate of Morgan Stanley ("**MS Mission**") and separately agreements are being entered into with the principal of the former owners of the Property (H. David Choo; "**Choo**") and his affiliated entities. Choo will be an equity member of TMG and shall share in a portion of the promote payable to TMG. The acquisition is subject to various settlement agreements between affiliates of Choo and MS Mission and approval of the Bankruptcy Court and Superior Court. |
| **Purpose:** | Northwood and TMG intend to form a Delaware limited liability company (the "**Company**") to own, operate, develop and eventually dispose of the Property. The initial business plan for the Company (the "**Initial Business Plan**") shall be approved by the Members before the acquisition of the Property. |
| **Capital Contributions:** | The parties shall contribute capital to the Company as follows: (i) TMG shall contribute the $5,000,000 contribution that it will receive from Choo, (ii) TMG shall contribute 2.5% of the balance of the amount required to be contributed to the Company in connection with the acquisition of the Property (the "**Closing Contribution**"), and (iii) Northwood shall contribute 97.5% of the balance of the Closing Contribution (the "**Initial Capital**"). The parties, before purchase of the Property, shall approve a budget (the "**Initial Budget**") for the implementation of the Initial Business Plan. Additional Capital to pay costs anticipated in the Initial Budget shall be contributed 2.5% by TMG and 97.5% by Northwood, except that contributions made after any distributions have been made under the second level of the waterfall (see Distributions, below) will be made in the same proportions as such distributions until all distributions under the second of the waterfall have been recontributed. Failure to contribute Additional Capital in accordance with the Initial Budget and the Initial Business Plan shall entitle the contributing member to exercise customary remedies of dilution or loans to the Company or the non-contributing member. |

9048005.5

- 1 -

Case: 11-49300    Doc# 298-6    Filed: 05/16/13    Entered: 05/16/13 18:41:19    Page 16 of 18

| | |
|---|---|
| **Management:** | Day-to-day operations will be administered by TMG and managed by TMG Partners, subject to the terms of any Business Plan and Budget and various other requirements and limitations. Northwood shall have the right of approval of certain Major Decisions to be specified in the Operating Agreement of the Company. |
| **Reporting:** | The Company will render customary, periodic reports to its members. |
| **Distributions:** | Net cash flow (including sales and refinancing proceeds) of the Company, after payment of all debt service, expenses, and appropriate working capital reserves, shall be distributed periodically as follows: |

- First, to the Members based on their "**Company Percentages**" (i.e., their then applicable proportions of gross capital contributions, as the same may be adjusted in connection with failure to contribute Additional Capital, and it being understood that TMG's gross capital contributions shall include the $5,000,000 contribution that it will receive from Choo) until Northwood has received the following with respect to all of its contributions: (i) a 12% per annum IRR, compounded quarterly (i.e., 3% per quarter, compounded quarterly), for the first 6 years after the applicable contribution is made; and (ii) thereafter, an 8% per annum IRR, compounded quarterly (i.e., 2% per quarter, compounded quarterly), on each such contribution.

- Second, 80% to the Members based on their Company Percentages and 20% to TMG as a Promote.

There shall be no clawback of amounts previously distributed, except as described under Capital Contributions, above.

| | |
|---|---|
| **Fees:** | TMG Partners shall be paid a lease override fee equal to $2.00/square foot of all space under signed leases (which will be payable ½ on lease signing and ½ on occupancy and expiration of any free rent period) and $1.00/square foot for all lease renewals. TMG Partners shall also receive a property management fee equal to the greater of $5,000/month or 2.5% of gross rentals received by the Company (plus the out of pocket costs of any on-site employees). TMG Partners shall also be paid a to-be-negotiated pre-development fee. |
| **Termination:** | Northwood shall have customary rights of termination, which shall have customary repercussions. |

**Other Terms:** The Operating Agreement shall be prepared by Northwood's counsel and shall include such other terms as are required by Northwood and acceptable to the Members.

**Non-Binding Agreement:** Except for this paragraph, this Term Sheet is non-binding and no party shall have any legal obligations to any other party (including any obligation to negotiate further) unless and until a binding, mutually acceptable definitive document is executed by all of such parties.

Agreed and accepted as of this 6th day of May, 2013.

NWFM LLC,
a Delaware limited liability company

By: _____
Name: Brady Thurman
Title: Managing Director

Agreed and accepted as of this 6th day of May, 2013.

TMG PARTNERS,
a California corporation

By: _____
Name: Cathy Greenwold
Title: EVP